EMILIO M. GARZA, Circuit Judge:
The single issue before us is whether the plaintiffs in this case — the Sierra Club, the Texas Committee on Natural Resources (“TCONR”), and the Wilderness Society (collectively, the “environmental groups”) — limited their challenge to identifiable final agency actions of the United States Forest Service. See 5 U.S.C. § 704. Because we conclude that they did not, and that the district court therefore exceeded its jurisdiction in hearing their challenge, we vacate and remand.
I
A
The Forest Service’s regulation of the National Forest system is governed by the National Forest Management Act of 1976 (“NFMA”).[1] See 16 U.S.C. § 1600, et seq.[2] Among other things, the NFMA requires the Forest Service to prepare a land and resource management plan (“LRMP”) for each unit of the National Forest System. See 16 U.S.C. § 1604(a). LRMPs govern use of the individual forests, and they must fulfill the Forest Service’s mandate to “provide for multiple use and sustained yield ... includ[ing] coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.” Id. at § 1604(e)(1);[3] see also Ohio Forestry *562 Ass’n, Inc. v. Sierra Club, 523 U.S. 726, 729, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (citing 16 U.S.C. § 1604(g) and 36 C.F.R. § 219.1(a) and stating that LRMPs must further both commercial and environmental goals); Sierra Club v. Robertson, 28 F.3d 753, 755 (8th Cir.1994) (“[A]n LRMP is, in essence, a programmatic statement of intent that establishes basic guidelines and sets forth the planning elements that will be employed by the Forest Service in future site-specific decisions.”).
Preparation of an LRMP is the first step in timber harvesting. The second step occurs when the-Forest Service authorizes harvesting in a specific location by selecting a timber sale area, preparing an environmental assessment (“EA”), allowing public comment, and awarding a timber harvesting contract to the highest bidder. See 36 C.F.R. 223.1, et seq. The Forest Service can do this “only after analyzing timber management alternatives and the sale’s particular environmental consequences,” Sierra Club v. Espy, 38 F.3d 792, 795 (5th Cir.1994), and after determining that the decision to sell in a given area is consistent -with the LRMP, 16 U.S.C. § 1604©; 36 C.F.R. §§ 219.10(e), 223.30.
B
The focus of this case has changed several times since the environmental groups initiated it in 1985. The single constant has been their disagreement with the Forest Service’s administration of the Texas National Forests.[4]
The current incarnation of this litigation involves the environmental groups’ objections to “even-aged timber management” in the Texas forests. Even-aged management encompasses timber harvesting techniques which involve cutting all or almost all of the trees in the same stand at the same time.[5] This results “in the creation of stands in which trees of essentially the same age grow together.” 36 C.F.R. § 219.3. The NFMA allows even-aged management if the Forest Service determines that such techniques are “appropriate” (or, in the case of clearcutting, that it is the “optimum method”) for complying, with the non-commercial goals of the LRMP. See 16 U.S.C. § 1604(g)(3)(F)(i); see also Espy, 38 F.3d at 800 (noting that “[t]he regulations implementing NFMA provide a minimum level of protection” of non-timber-harvesting interests).
In 1987, the Forest Service developed an LRMP and an accompanying EIS for the Texas forests which used even-aged management as the primary means of timber harvesting. After the environmental groups administratively challenged this LRMP, the Chief of the Forest Service remanded it for revision in 1989. In the interim, the Chief adopted a temporary scheme for managing the Texas forests, allowing the Forest Service to make decisions regarding the choice of timber management techniques at the site-specific level, and allowing even-aged management at specific sites if such management generally complied with the 1987 Plan.
This portion of the litigation has involved the environmental groups’ attempts since then to halt the use of even-aged management in the Texas forests. The *563 broad scope of their challenge has remained constant: while they have identified specific Forest Service acts which they allege violate the NFMA, they have consistently challenged the Forest Service’s entire program of allowing timber harvesting in the Texas forests.
The environmental groups filed their Fourth Amended Complaint in 1992. This complaint raised “four major claims,” 4th Am. Compl. at 1, including the even-aged management claim at issue here. The environmental groups cited twelve allegedly ripe and allegedly improper timber sales in support of this claim, but they made clear that these sales were examples of the larger even-aged management techniques they were challenging rather than the extent of their challenge.[6] Accordingly, the complaint requested broad injunctive relief blocking further timber sales or even-aged management in the “national forests in Texas.” Id. at 34-35.
In 1993, the district court granted a preliminary injunction against “further even-aged logging.” Sierra Club v. Espy, 822 F.Supp. 356, 370 (E.D.Tex.1998). We reversed. See Espy, 38 F.3d at 803. As an initial matter, recognizing the over-breadth of the injunction, we limited it to the “nine pending timber sales” which the court properly had before it. See id. at 798 (“The district court’s order appears to enjoin the Forest Service’s entire even-aged management agenda; however it is clear that the court had before it only the nine pending timber sales. TCONR concedes that the injunction, properly read, applies only to the nine sales”). We then vacated and remanded, holding that the injunction was based on the district court’s mistaken view that, under the NFMA, even-aged management techniques “could only be used in exceptional circumstances.” Id. at 798-803.
On remand, the environmental groups asked the district court for a trial on their even-aged management claim. Their trial request focused on their argument that the Forest Service’s “on-the-ground” use of even-aged management violated the NFMA. The request was as broad in scope as the Fourth Amended Complaint. See Trial Req. at 3 (“Since virtually every even-age logging operation in the national forests in Texas involved failure to protect ... resources ..., such operations run into the thousands, generally with similar *564 harmful results.”)- It identified “instances [ranging from the 1970s to 1995] of places and times where Defendants have failed and are failing to carry out protection of diversity and the congressionally designated resources,” id. at 3-4; see also id. at Appendix I at 5, 14 (same), and it asked the court to conduct a trial “before Defendants advertise any even-age sales,” id. at 18.[7]
The environmental groups next filed a “Supplemental Complaint,” which re-enumerated their charges that the Forest Service was violating the NFMA. Although the Supplemental Complaint identified “18 [scheduled] even-age cutting decisions,” it again generally challenged the Forest Service’s allowance of even-aged management, noting that several of the violations had been ongoing “[e]ver since the [1976] enactment of NFMA.” Supplemental Compl. at 1, 4, 6. It again contained a request for a broad injunction against even-aged management practices.
The district court granted the environmental groups’ trial request and held a seven-day bench trial on three issues:
(1) Whether the Forest Service has, in practice, as required by the regulations, kept current and adequate inventories and monitoring data for key resources in the national forests in Texas; (2) Whether the Forest Service has, in practice, as required by the regulations, protected key resources in its application of even-aged management techniques; and (3) Whether the Forest Service has, in practice, as required by the regulations, provided for diversity of plant and animal communities in its application of even-aged management techniques.
Sierra Club, 974 F.Supp. at 912. To establish its jurisdiction, the court concluded that the environmental groups had challenged a “final agency action,” a prerequisite to suit against an administrative agency under the Administrative Procedure Act (“APA”). The court identified the final agency action as the Forest Service’s general allowance of even-aged management in the Texas forests rather than any specific timber sales the Forest Service decided to allow in the forests:
The Forest Service’s failure to implement timber sales in compliance with the NFMA and regulations, as alleged by Plaintiffs, is a final agency action for purposes of section 704. Once the Forest Service adopted a final, definite course of action or inaction with respect to the management of the forest lands (regardless of whether that action or inaction is memorialized in a written agency decision), the court has a “final agency action” to review.
Id. at 914 (discussing 5 U.S.C. § 704).
On the merits, the court concluded that the Forest Service had violated its duties under the NFMA to protect resources and to monitor and inventory.[8] Accordingly, *565 the court entered a permanent injunction barring the Forest Service from allowing almost any timber harvesting[9] “until such time that the Forest Service (1) complies with the NFMA and regulations with respect to the implementation of past timber sales and (2) assures the court that any future timber harvesting will be in compliance on-the-ground.” Id. at 945.
The Forest Service appealed,[10] challenging several aspects of the court’s ruling. A panel of this court affirmed. See Sierra Club v. Peterson, 185 F.3d 349, 375 (5th Cir.1999). Significantly, the panel found that the environmental groups had challenged two distinct final agency actions: “the decision to engage in timber sales resulting from even-aged management and the failure to inventory and to monitor [certain species].” Id. at 364. We granted en banc review, see Sierra Club v. Peterson, 204 F.3d 580 (5th Cir.2000), thereby vacating the panel opinion, and we directed the parties to address whether the environmental groups had actually challenged a specific final agency action.
II
The NFMA does not provide for judicial review of Forest Service decisions, and therefore the general review provisions of the APA apply by default. See American Airlines, Inc. v. Herman, 176 F.3d 283, 287 (5th Cir.1999). These provisions limit our review to a “final agency action.” See 5 U.S.C. § 704 (“Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.”); Lujan v. National Wildlife Fed’n, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (“When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the ‘agency action’ in question must be ‘final agency action.’ ”). Final agency actions are actions which (1) “mark the consummation of the agency’s decisionmaking process,” and (2) “by which rights or obligations have been determined, or from which legal conse- ' quences will flow.” Bennett v. Spear, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quotations omitted). The final action must be “an identifiable action or event.” Lujan, 497 U.S. at 899, 110 S.Ct. 3177. Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct. See American Airlines, 176 F.3d at 287.
In Lujan, the plaintiff challenged the Secretary of the Interior’s entire “land *566 withdrawal review program.” See Lujan, 497 U.S. at 877-79, 110 S.Ct. 3177. The program covered the Bureau of Land Management’s (“BLM’s”) activities in complying with the Federal Land Policy and Management Act of 1976 (“FLPMA”). See id. at 877, 110 S.Ct. 3177. The Court found that the plaintiffs claim failed because the plaintiff had not challenged a particular final agency action. Instead of limiting its challenge to a “single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations,” the plaintiff challenged “the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA.” Id. at 890, 110 S.Ct. 3177.
Lujan thus announced a prohibition on. programmatic challenges: “respondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.” Id. at 891, 110 S.Ct. 3177. The decision makes clear that this prohibition is motivated by institutional limits on courts which constrain our review to narrow and concrete actual controversies. See id. at 891-94, 110 S.Ct. 3177. We thereby not only avoid encroaching on the other branches of government, but we continue to respect the expert judgment of agencies specifically created to deal with complex and technical issues. Cf, e.g., Cronin v. United States Dep’t of Agric., 919 F.2d 439, 444 (7th Cir.1990) (“Administrative agencies deal with technical questions, and it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency. Trees may seem far removed from the arcana of administrative determination, but one has only to glance at the documents submitted in this case to realize that ‘silviculture’ is in fact a technical field, and not just one with a dry and forbidding vocabulary.”); Espy, 38 F.3d at 799 (“NFMA was an effort to place the initial technical, management responsibility for the application of NFMA guidelines on the responsible government agency, in this case the Forest Service.”) (quotations omitted).
The environmental groups’ challenge is precisely the type of programmatic challenge that the Supreme Court struck down in Lujan. The environmental groups challenged past, ongoing, and future timber sales approved by the Forest Service, and they argued that the Forest Service failed to monitor and inventory properly in conducting these sales. This challenge sought “wholesale improvement,” see Lujan, 497 U.S. at 891, 110 S.Ct. 3177, of the Forest Service’s “program” of timber management in the Texas forests, objecting to Forest Service practices throughout the four National Forests in Texas and covering harvesting from the 1970s to timber sales which have not yet occurred. This is not a justiciable challenge because the program of timber management to which the environmental groups object does not “mark the ‘consummation’ of the agency’s decisionmaking process,” Bennett, 520 U.S. at 178, 117 S.Ct. 1154, or constitute “an identifiable action or event,” Lujan, 497 U.S. at 899, 110 S.Ct. 3177 (“[T]he ‘land withdrawal review program’ is not an identifiable action or event.”). Instead, as in Lujan, the environmental groups have impermissibly attempted to “demand a general judicial review of the [Forest Service’s] day-to-day operations.” Id. The district court’s accession to this demand, by reviewing and then enjoining almost all of the Forest Service’s program of timber management in Texas forests until the Forest Service complies with the NFMA, exceeded the court’s jurisdiction under the APA.[11]
*567 Nor is this programmatic challenge made justiciable by the fact that the environmental groups identified some specific sales in their pleadings that they argue are final agency actions. The environmental groups can challenge “a specific ‘final agency action’ [which] has an actual or immediately threatened effect,” even when such a challenge has “the effect of requiring a regulation, a series of regulations, or even a whole ‘program’ to be revised by the agency.” Lujan, 497 U.S. at 894, 110 S.Ct. 3177. However, this ability does not allow the environmental groups to challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program, which is precisely what they did here. Rather than limit their challenge to individual sales, they merely used these sales as evidence to support their sweeping argument that the Forest Service’s “on-the-ground” management of the Texas forests over the last twenty years violates the NFMA. This is clear from their allegations, which addressed the entire Texas forests, from their evidence, which concerned practices throughout the Texas forests and which dated back to implementation of the NFMA, and from their requested relief.
Similarly, the district court noted three broad trial issues before it, going to the Forest Service’s entire management of the Texas forests. See Sierra Club, 974 F.Supp. at 912 (stating one issue as “[wjhether the Forest Service has, in practice, as required by the regulations, kept current and adequate inventories and monitoring data for key resources in the national forests in Texas ”) (emphasis added). The court did not limit its review to any specific sales but repeatedly reviewed NFMA compliance “on-the-ground” — ie., throughout the Texas forests. See, e.g., id. at 918 (justifying its decision to focus primarily on sales in one compartment by stating that “the activities occurring on Compartment 98 of the Sam Houston National Forest are generally typical of even-aged regeneration activities across the National Forests in Texas.”); id. at 927 (finding that “[o]n-the-ground, however, the Forest Service permits logging for timber production purposes right up to the stream banks throughout the National Forests in Texas.”). It then granted correspondingly broad relief barring almost all timber harvesting in the Texas forests. See Sierra Club, 974 F.Supp. at 945.
The scope of the environmental groups’ claims and the relief they obtained go well beyond any challenge to discrete sales. Both make clear that the environmental groups improperly obtained “a general judicial review of the [Forest Service’s] day-to-day operations.” Lujan, 497 U.S. at 899, 110 S.Ct. 3177. Lujan is controlling on this point: “it is at least entirely certain that the flaws in the entire ‘program’— *568 consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well — cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent’s members.” Id. at 892-93, 110 S.Ct. 3177; see also id. at 879, 110 S.Ct. 3177 (finding no final agency action, even though “[ajppended to the amended complaint was a schedule of specific land-status determinations, which the complaint stated had been ‘taken by defendants since January 1,1981’ ”).[12]
The environmental groups also cannot maintain their challenge under the alternative theory that the Forest Service “failed to act.” In certain circumstances, agency inaction may be sufficiently final to make judicial review appropriate. See 5 U.S.C. § 706(1) (allowing courts “to compel agency action unlawfully withheld or unreasonably delayed”); Sierra Club v. Thomas, 828 F.2d 783, 792-96 (D.C.Cir.1987) (discussing different forms of agency inaction). The Forest Service’s alleged failure to comply with the NFMA in maintaining Texas’s national forests, however, does not reflect agency inaction. The Forest Service has not failed to issue an LRMP or to conduct timber sales. Nor have the environmental groups argued that the Forest Service did not attempt to comply with the NFMA. Instead, the Forest Service has been acting, but the environmental groups simply do not believe its actions have complied with the NFMA. Cf. Ecology Center, Inc. v. United States Forest Serv., 192 F.3d 922, 926 (9th Cir.1999) (“This court has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action ‘dressed up as an agency’s failure to act.’ ”); Public Citizen v. Nuclear Regulatory Comm’n, 845 F.2d 1105, 1108 (D.C.Cir.1988) (“The agency has acted.... Petitioners just do not like what the Commission did.... Our acceptance of petitioners’ argument would make a nullity of statutory deadlines. Almost any objection to an agency action can be dressed up as an agency’s failure to act.”).
Underlying the district court’s opinion was a concern that finding no final agency action here “would put all of the Forest Service’s on-the-ground violations of the NFMA and regulations beyond review.” Sierra Club, 974 F.Supp. at 915. This concern is misplaced insofar as the environmental groups still may challenge discrete site-specific sales allowed by the Forest Service. See Ohio Forestry Ass’n, 523 U.S. at 734, 118 S.Ct. 1665, (“[Bjefore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court.”); id. at 734-35, 118 S.Ct. 1665 (“The Sierra Club .... does not explain, however, why one initial site-specific victory (if based on the Plan’s unlawfulness) could not, through preclusion principles, effectively carry the day.”); Lujan, 497 U.S. at 894, 110 S.Ct. 3177 (noting that a challenge to a specific final agency action “may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole ‘program’ to be revised by the agency in order to avoid the unlawful result that the court discerns”). Judicial review can then take place with the “benefit of the focus that a particular logging -proposal could provide.” *569 Ohio Forestry Ass’n, 523 U.S. at 736, 118 S.Ct. 1665.
This is precisely what the plaintiffs did in Sierra Club v. Martin, 168 F.3d 1 (11th Cir.1999). The plaintiffs challenged seven timber sales in a Georgia national forest, arguing that the Forest Service’s decision to permit the sales violated the NFMA.[13] See id. at 2. The Eleventh Circuit considered the merits of their discrete challenge because it presented a concrete, justiciable controversy. See id. at 3-8 (finding that the Forest Service violated the NFMA and accompanying regulations in allowing the timber sales); cf. Inland Empire Public Lands Council v. United States Forest Serv., 88 F.3d 754, 759-65 (9th Cir.1996) (reviewing the merits of a NFMA and NEPA challenge to eight proposed timber sales on the merits); Sierra Club v. United States Forest Serv., 46 F.3d 835, 839-40 (8th Cir.1995) (reviewing the merits of a NEPA challenge to two timber sales).
Similarly, the Wilderness Society appears to argue that our ruling will prevent it from challenging the manner in which specific timber sales are implemented. This issue is not before us because the environmental groups did not attack the implementation of specific timber sales but rather attacked general Forest Service practice in the Texas forests. Thus, we need not address whether the implementation of a timber sale, as opposed to the announcement of the timber sale, is a final agency action which can be challenged in court. Nor need we address limits plaintiffs face on when they can introduce evidence of past timber sales and their implementation to show that specific timber sales before the court are improper. Instead, we determine that where, as here, the challenge extends to general forestry practices, we lack jurisdiction to consider it.
Requiring plaintiffs to challenge individual timber sales may place a higher burden on environmental groups wishing to monitor Forest Service management practices. However, this does not allow us to disregard the jurisdictional requirement of a final agency action. See Lujan, 497 U.S. at 894, 110 S.Ct. 3177 (rejecting the plaintiffs programmatic challenge even though “[t]he case-by-case approach ... is understandably frustrating to an organization such as respondent”); cf. Ohio Forestry Ass’n, 523 U.S. at 735, 118 S.Ct. 1665 (“[T]he Court has not considered this kind of litigation cost-saving sufficient by itself to justify review in a case that would otherwise be unripe.”). As the Court noted in Lujan, judicial review of specific final agency actions “is the traditional, and remains the normal, mode of operation of the courts.” Lujan, 497 U.S. at 894, 110 S.Ct. 3177. Courts are not equipped, nor are they the proper body, to resolve the technical issues involved in agency decision-making at “a higher level of generality.” Id. Instead, until confided to us, these kinds of “sweeping” review are reserved to the other branches “where programmatic improvements are normally made.” Id. at 891, 497 U.S. 871, 110 S.Ct. 3177.
Ill
Under the APA, the district court only had jurisdiction over challenges to identifiable final agency actions. See 5 U.S.C. § 704. Here, the district court acted out *570 side its jurisdiction in reaching the merits of the environmental groups’ programmatic challenge, thereby ignoring the critical limits on judicial review which define the role of courts in the modern administrative state. Because this was improper, we VACATE the court’s judgment and REMAND for proceedings not inconsistent with this opinion.[14]

.The NFMA directed the Forest Service to adopt implementing regulations. See 16 U.S.C. § 1604(g). These regulations, see 36 C.F.R. § 219.1, et seq., and the NFMA, both of which were at issue in the trial below, are collectively referred to herein as "NFMA.”

. The Department of Agriculture is statutorily charged with administration of the National Forest System. See 16 U.S.C. § 1604(a). The Department has in turn delegated this responsibility to the Forest Service. See 36 C.F.R. § 200.3(b)(2).

. The NFMA operates in conjunction with the National Environmental Policy Act ("NEPA”), see 16 U.S.C. § 1604(g)(1) (making the NEPA applicable to the NFMA), requiring the Forest Service to prepare an environmental impact statement ("EIS”) whenever it issues an LRMP, see 36 C.F.R. 219.10(b).

. These forests — the Sam Houston, the Davy Crockett, the Angelina, and the Sabine — cover 639,000 acres in Texas. Each forest is divided into ''compartments,” which are in turn divided into ''stands.”

. Even-aged management methods include clearcutting (where all the trees in a stand- are cut at once), seed tree cutting (where a few trees per stand are temporarily left uncut to reseed the stand), and shelterwood cutting, (where twice as many trees are left in a stand 'as under the seed tree cutting method). See Sierra Club v. Espy, 38 F.3d 792, 795 (5th Cir.1994) ("Even under the least intrusive even-aged management technique, shelter-wood cutting, only about sixteen trees per acre remain after a cut.”). Even-aged management contrasts with uneven-aged management (also called selection management), which involves selective cutting and which therefore results in differently-aged trees in the same stand. See id. at 796.

. The complaint continually discusses general Forest Service practices. See id. at 19 ("The LRMP provides, among other items, for even-age management of 100% of the 'suitable lands', which is new Forest Service terminology for available commercial timber, in the four national forests in Texas, 60% to be harvested by clearcutting, and 40% by seed-tree and shelterwood methods, at end of rotation. The Defendants are engaged in selling national forest sawlogs to private loggers under a ratio almost that high, and in many other practices of even-age management, including site preparation of virtually all stands after such harvesting.”) (numbering omitted); id. at 20 (“[T]he Supervisor has issued, executed, and implemented numerous site-specific decisions, environmental assessments (EA’s), sale prospecti, solicitations for quotation, and other processes.... They total tens of thousands of acres, devastating vast segments of the forests.”); id. ("The LRMP, the ongoing course of conduct, the site-specific EA's and decisions, and the scheduled sales and contracts aforesaid are in violation of the following sections of NFMA in each of the following ways....”). It then addresses “New Sales” by stating that "Defendants continue to render and to implement decisions to conduct predominant even-age logging practices.” Id. at 23-24; see also id. at 23 ("Defendants have unduly prolonged their unlawful practice of predominant clearcutting, seed-tree cutting, shelter-wood cutting, denudation by site preparation, and monoculture planting far beyond the first estimate for a final decision on TCONR’s objection.”). It references "Exhibit A [which] is a list of some of these sales,” id. at 24, but it makes clear that the even-aged management claim extends beyond these sales: "Altogether, these sales, plus other even-age practices such as site preparation, single-species planting, hardwood suppression, and salvage logging, amount to an average of at least 2.3% of the available commercial timberland in the four national forests.... At this rate, Defendants will eliminate all native biodiversity from these timberlands in less than 16 years, unless this Court restrains such operations,” id. at 24-25.

. The breadth of the environmental groups’ challenge was apparent throughout their trial request. For example, they stated that the Forest Service failed to protect wildlife, recreation, aesthetics, and diversity ”[i]n virtually all even-age operations.” Id. at 7. They noted that "[s]everal of Defendants’ damaging practices, forest-wide., were not necessary even for even-age logging.” Id. at 10 (emphasis added). They stated that “Defendants have failed to make any selection management timber sales for 19 years after enactment of NFMA.” Id. at 11. They then asked for a remedy "Manning even-age logging until the defendants comply with NFMA.” Id. at 18. Finally, they identified "Specific Examples of Failure to Carry Out Protection” which extended from the 1970s to 1995. Id., Appendix I at 2, Appendix II at 1; see also id., Appendix I at 1 ("In these appendices, Plaintiffs provide instances of Defendants’ failure to protect con-gressionally protected resources to indicate what is happening throughout the four national forests in Texas.”).

. Specifically, the court determined that the Forest Service was violating its duties to protect: soil resources, see 16 U.S.C. § 1604(g)(3)(E)(i), (g)(3)(F)(v); 36 C.F.R. § 219.27(a)(1), (b)(5), (c)(6), (f); and watershed resources, see 16 U.S.C. § 1604(g)(3)(E)(i), (g)(3)(E)(iii), (g)(3)(F)(v); 36 C.F.R. § 219.27(a)(1), (a)(4), (b)(5), (c)(6), (e), (f). See Sierra Club, 974 F.Supp. at 942. Additionally, the court found that the Forest Service was not inventorying and monitoring *565 the following properly: wildlife, see 16 U.S.C. § 1604(g)(2)(B), (g)(3)(C); 36 C.F.R. §§ 219.11(d), 219.12(d), (k), 219.19(a)(1), (a)(2), (a)(5), (a)(6); diversity, see 36 C.F.R. § 219.26; and its success in meeting its objectives and adhering to its standards, see 36 C.F.R. § 219.12(k). See Sierra Club, 974 F.Supp. at 942.

. The court continued to allow harvesting "for insect or disease control, fire protection, or any other reason necessary to maintain the health of the forest land.” Id. at 945.

. The Texas Forestry Association and the Southern Timber Purchasers Council, to whom we had previously granted leave to intervene, see Sierra Club v. Espy, 18 F.3d 1202, 1208 (5th Cir.1994), separately appealed.
On appeal, the environmental groups continue to make clear that they are broadly challenging Forest Service practice in the Texas forests rather than limiting their challenge to discrete sales. See, e.g., Br. of TCONR and Sierra Club at 5 ("The facts, testimony and photographs demonstrated overwhelming violations of laws and regulations in Compartment 98 and throughout the Texas National Forests.”); id. at 12 ("This lawsuit is not an appeal of an adjudicatory decision by the Forest Service. It is a challenge to the carrying out and results of (not a plan for) clearcutting and its variant harvesting practices in Texas National Forests.”) (emphases in original); id. at 26 ("The Forest Service's carrying out of its even-age logging program, and the physical results thereof, are substantive actions specifically covered by NFMA.”); id. at 33 (“The violations of law are ongoing, occur throughout the Texas National Forests, and could not be remedied absent the relief granted by the district court.”); Br. of Wilderness Society at 29 ("Where there is systemwide impact, there may be systemwide relief.”).

. Some of the individual acts the environmental groups challenge present their own *567 justiciability problems which the environmental groups seek to avoid by consolidating them into its programmatic challenge. The environmental groups could not directly challenge many of the completed timber sales whose effects they complain of because these sales would now be moot. See Florida Wildlife Fed’n v. Goldschmidt, 611 F.2d 547, 549 (5th Cir.1980) (“Where the activities sought to be enjoined have already substantially occurred and the appellate court can not undo what has already been done, the action is moot.”). Insofar as the environmental groups challenge a failure to inventory or monitor that has not yet resulted in any legal consequences, these challenges are not ripe. Cf. Ohio Forestry Ass’n, 523 U.S. at 733-34, 118 S.Ct. 1665 (finding that a challenge to an LRMP was not ripe because the Plan's provisions "do not command anyone to do anything or to refrain from doing anything; they do not grant; withhold, or modify any formal legal license, power or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. ... [BJefore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court.”); Ecology Center, Inc. v. United States Forest Serv., 192 F.3d 922, 925 (9th Cir.1999) ("[A]l-though the Forest Service’s monitoring duty is mandatory under the Plan, legal consequences do not necessarily flow from that duty, nor do rights or obligations arise from it.”).

. Disagreeing with our reading of Lujan, the dissent would hold that the environmental groups’ references to specific timber sales makes their challenge to the entire administration of the Texas forests justiciable. As discussed above and in Part I.B, we think it clear that the environmental groups were challenging the Forest Service's entire program of administering Texas forests. Additionally, as the above-cited language from Lu-jan makes clear, a plaintiff cannot challenge an entire program simply by referencing specific actions undertaken as part of that program. Instead, the necessary institutional limitations on courts which Lujan identified limit our review of agency action to only specific and final agency actions.

. The Martin plaintiffs limited their challenge to these sales, sought relief only as to these sales, and did not attempt to challenge the Forest Service's general administration of national forests. Accordingly, the court did not even need to address the final agency action issue we discuss here.
In contrast to Martin, but closer to the case here, is Ecology Center. In Ecology Center, the plaintiff challenged the Forest Service's failure to monitor resources under an LRMP, arguing that this violated the NFMA and its implementing regulations. The Ninth Circuit affirmed the lower court's dismissal for lack of subject matter jurisdiction because the plaintiff had not challenged a final agency action. See Ecology Center, 192 F.3d at 926. Although the challenge in Ecology Center was narrower than the sweeping challenge here, both challenges ask the court to review some agency conduct which does not mark the culmination of a decision-making process.

. These proceedings may include a trial limited to any existing specific final agency actions the environmental groups wish to challenge, such as announced timber sales, which have "an actual or immediately threatened effect." See Lujan, 497 U.S. at 894, 110 S.Ct. 3177.