**REVISED OCTOBER 9, 2000**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

---

No. 97-41274

---

SIERRA CLUB; WILDERNESS SOCIETY; TEXAS COMMITTEE
ON NATURAL RESOURCES,

Plaintiffs - Appellees,

versus

R. MAX PETERSON; ET AL,

Defendants,

DANIEL GLICKMAN, In his official capacity as the Secretary of the
Department of Agriculture; ELIZABETH ESTILL, In her official
capacity as the Regional Forester, US Forest Service, Region 8;
MICHAEL DOMBECK, In his official capacity as Chief, US Forest
Service; RONALD RAUM, In his official capacity as the Forest
Supervisor, National Forests and Grasslands in Texas,

Defendants - Appellants,

TEXAS FORESTRY ASSOCIATION; SOUTHERN TIMBER
PURCHASERS COUNCIL,

Intervenor - Defendants - Appellants.

---

Appeal from the United States District Court
For the Eastern District of Texas

September 20, 2000

Before POLITZ, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, and DENNIS, Circuit Judges.[*]

EMILIO M. GARZA, Circuit Judge:

---

[*]     Judges Jolly, Higginbotham, Davis, Jones, Smith, Barksdale, and DeMoss concur in the majority opinion. Judge Higginbotham files a separate concurrence. Judges Politz, Wiener, Benavides, and Dennis concur in Judge Stewart's dissent. Chief Judge King did not participate in this decision. Judge Parker is recused and did not participate.

The single issue before us is whether the plaintiffs in this case—the Sierra Club, the Texas Committee on Natural Resources ("TCONR"), and the Wilderness Society (collectively, the "environmental groups")—limited their challenge to identifiable final agency actions of the United States Forest Service. *See* 5 U.S.C. § 704. Because we conclude that they did not, and that the district court therefore exceeded its jurisdiction in hearing their challenge, we vacate and remand.

## I

## A

The Forest Service's regulation of the National Forest system is governed by the National Forest Management Act of 1976 ("NFMA").[1] *See* 16 U.S.C. § 1600, *et seq.*[2] Among other things, the NFMA requires the Forest Service to prepare a land and resource management plan ("LRMP") for each unit of the National Forest System. *See* 16 U.S.C. § 1604(a). LRMPs govern use of the individual forests, and they must fulfill the Forest Service's mandate to "provide for multiple use and sustained yield . . . includ[ing] coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id.* at § 1604(e)(1);[3] *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998) (citing 16 U.S.C. § 1604(g) and 36 C.F.R. § 219.1(a) and stating that LRMPs must further both commercial and environmental goals); *Sierra*

---

[1]    The NFMA directed the Forest Service to adopt implementing regulations. *See* 16 U.S.C. § 1604(g). These regulations, *see* 36 C.F.R. § 219.1, *et seq*., and the NFMA, both of which were at issue in the trial below, are collectively referred to herein as "NFMA."

[2]    The Department of Agriculture is statutorily charged with administration of the National Forest System. *See* 8 U.S.C. § 1604(a). The Department has in turn delegated this responsibility to the Forest Service. *See* 36 C.F.R. § 200.3(b)(2).

[3]    The NFMA operates in conjunction with the National Environmental Policy Act ("NEPA"), *see* 16 U.S.C. § 1604(g)(1) (making the NEPA applicable to the NFMA), requiring the Forest Service to prepare an environmental impact statement ("EIS") whenever it issues an LRMP, *see* 36 C.F.R. 219.10(b).

*Club v. Robertson*, 28 F.3d 753, 755 (8th Cir. 1994) ("[A]n LRMP is, in essence, a programmatic statement of intent that establishes basic guidelines and sets forth the planning elements that will be employed by the Forest Service in future site-specific decisions.").

Preparation of an LRMP is the first step in timber harvesting. The second step occurs when the Forest Service authorizes harvesting in a specific location by selecting a timber sale area, preparing an environmental assessment ("EA"), allowing public comment, and awarding a timber harvesting contract to the highest bidder. *See* 36 C.F.R. 223.1, *et seq.* The Forest Service can do this "only after analyzing timber management alternatives and the sale's particular environmental consequences," *Sierra Club v. Espy*, 38 F.3d 792, 795 (5th Cir. 1994), and after determining that the decision to sell in a given area is consistent with the LRMP, 16 U.S.C. § 1604(i); 36 C.F.R. §§ 219.10(e), 223.30.

**B**

The focus of this case has changed several times since the environmental groups initiated it in 1985. The single constant has been their disagreement with the Forest Service's administration of the Texas National Forests.[4]

The current incarnation of this litigation involves the environmental groups' objections to "even-aged timber management" in the Texas forests. Even-aged management encompasses timber harvesting techniques which involve cutting all or almost all of the trees in the same stand at the same time.[5] This results "in the creation of stands in which trees of essentially the same age grow

---

[4] These forests—the Sam Houston, the Davy Crockett, the Angelina, and the Sabine—cover 639,000 acres in Texas. Each forest is divided into "compartments," which are in turn divided into "stands."

[5] Even-aged management methods include clearcutting (where all the trees in a stand are cut at once), seed tree cutting (where a few trees per stand are temporarily left uncut to reseed the stand), and shelterwood cutting, (where twice as many trees are left in a stand as under the seed tree cutting method). *See Sierra Club v. Espy*, 38 F.3d

together." 36 C.F.R. § 219.3. The NFMA allows even-aged management if the Forest Service determines that such techniques are "appropriate" (or, in the case of clearcutting, that it is the "optimum method") for complying with the non-commercial goals of the LRMP. *See* 16 U.S.C. § 1604(g)(3)(F)(i); *see also Espy*, 38 F.3d at 800 (noting that "[t]he regulations implementing NFMA provide a minimum level of protection" of non-timber-harvesting interests).

In 1987, the Forest Service developed an LRMP and an accompanying EIS for the Texas forests which used even-aged management as the primary means of timber harvesting. After the environmental groups administratively challenged this LRMP, the Chief of the Forest Service remanded it for revision in 1989. In the interim, the Chief adopted a temporary scheme for managing the Texas forests, allowing the Forest Service to make decisions regarding the choice of timber management techniques at the site-specific level, and allowing even-aged management at specific sites if such management generally complied with the 1987 Plan.

This portion of the litigation has involved the environmental groups' attempts since then to halt the use of even-aged management in the Texas forests. The broad scope of their challenge has remained constant: while they have identified specific Forest Service acts which they allege violate the NFMA, they have consistently challenged the Forest Service's entire program of allowing timber harvesting in the Texas forests.

The environmental groups filed their Fourth Amended Complaint in 1992. This complaint raised "four major claims," 4th Am. Compl. at 1, including the even-aged management claim at issue

---

792, 795 (5th Cir. 1994) ("Even under the least intrusive even-aged management technique, shelterwood cutting, only about sixteen trees per acre remain after a cut."). Even-aged management contrasts with uneven-aged management (also called selection management), which involves selective cutting and which therefore results in differently-aged trees in the same stand. *See id.* at 796.

here. The environmental groups cited twelve allegedly ripe and allegedly improper timber sales in support of this claim, but they made clear that these sales were examples of the larger even-aged management techniques they were challenging rather than the extent of their challenge.[6] Accordingly, the complaint requested broad injunctive relief blocking further timber sales or even-aged management in the "national forests in Texas." *Id.* at 34-35.

In 1993, the district court granted a preliminary injunction against "further even-aged logging." *Sierra Club v. Espy*, 822 F. Supp. 356, 370 (E.D. Tex. 1993). We reversed. *See Espy*, 38 F.3d at 803. As an initial matter, recognizing the overbreadth of the injunction, we limited it to the "nine pending timber sales" which the court properly had before it. *See id.* at 798 ("The district court's order appears to enjoin the Forest Service's entire even-aged management agenda; however it is clear that the court had before it only the nine pending timber sales. TCONR concedes that the injunction, properly read, applies only to the nine sales"). We then vacated and remanded, holding that the injunction was based on the district court's mistaken view that, under the NFMA, even-aged

---

[6]     The complaint continually discusses general Forest Service practices. *See id.* at 19 ("The LRMP provides, among other items, for even-age management of 100% of the 'suitable lands', which is new Forest Service terminology for available commercial timber, in the four national forests in Texas, 60% to be harvested by clearcutting, and 40% by seed-tree and shelterwood methods, at end of rotation. The Defendants are engaged in selling national forest sawlogs to private loggers under a ratio almost that high, and in many other practices of even-age management, including site preparation of virtually all stands after such harvesting.") (numbering omitted); *id.* at 20 ("[T]he Supervisor has issued, executed, and implemented numerous site-specific decisions, environmental assessments (EA's), sale prospecti, solicitations for quotation, and other processes . . . . They total tens of thousands of acres, devastating vast segments of the forests."); *id.* ("The LRMP, the ongoing course of conduct, the site-specific EA's and decisions, and the scheduled sales and contracts aforesaid are in violation of the following sections of NFMA in each of the following ways . . . ."). It then addresses "New Sales" by stating that "Defendants continue to render and to implement decisions to conduct predominant even-age logging practices." *Id.* at 23-24; *see also id.* at 23 ("Defendants have unduly prolonged their unlawful practice of predominant clearcutting, seed-tree cutting, shelterwood cutting, denudation by site preparation, and monoculture planting far beyond the first estimate for a final decision on TCONR's objection."). It references "Exhibit A [which] is a list of some of these sales," *id.* at 24, but it makes clear that the even-aged management claim extends beyond these sales: "Altogether, these sales, plus other even-age practices such as site preparation, single-species planting, hardwood suppression, and salvage logging, amount to an average of at least 2.3% of the available commercial timberland in the four national forests. . . . At this rate, Defendants will eliminate all native biodiversity from these timberlands in less than 16 years, unless this Court restrains such operations," *id.* at 24-25.

-5-

management techniques "could only be used in exceptional circumstances." *Id.* at 798-803.

On remand, the environmental groups asked the district court for a trial on their even-aged management claim. Their trial request focused on their argument that the Forest Service's "on-the-ground" use of even-aged management violated the NFMA. The request was as broad in scope as the Fourth Amended Complaint. *See* Trial Req. at 3 ("Since virtually every even-age logging operation in the national forests in Texas involved failure to protect . . . resources . . ., such operations run into the thousands, generally with similar harmful results."). It identified "instances [ranging from the 1970s to 1995] of places and times where Defendants have failed and are failing to carry out protection of diversity and the congressionally designated resources," *id.* at 3-4; *see also id.* at Appendix I at 5, 14 (same), and it asked the court to conduct a trial "before Defendants advertise any even-age sales," *id.* at 18.[7]

The environmental groups next filed a "Supplemental Complaint," which re-enumerated their charges that the Forest Service was violating the NFMA. Although the Supplemental Complaint identified "18 [scheduled] even-age cutting decisions," it again generally challenged the Forest Service's allowance of even-aged management, noting that several of the violations had been ongoing "[e]ver since the [1976] enactment of NFMA." Supplemental Compl. at 1, 4, 6. It again contained a request for a broad injunction against even-aged management practices.

---

[7] The breadth of the environmental groups' challenge was apparent throughout their trial request. For example, they stated that the Forest Service failed to protect wildlife, recreation, aesthetics, and diversity "[i]n virtually all even-age operations." *Id.* at 7. They noted that "[s]everal of Defendants' damaging practices, *forest-wide*, were not necessary even for even-age logging." *Id.* at 10 (emphasis added). They stated that "Defendants have failed to make any selection management timber sales for 19 years after enactment of NFMA." *Id.* at 11. They then asked for a remedy "[b]anning even-age logging until the defendants comply with NFMA." *Id.* at 18. Finally, they identified "Specific Examples of Failure to Carry Out Protection" which extended from the 1970s to 1995. *Id.*, Appendix I at 2, Appendix II at 1; *see also id.*, Appendix I at 1 ("In these appendices, Plaintiffs provide instances of Defendants' failure to protect congressionally protected resources to indicate what is happening throughout the four national forests in Texas.").

The district court granted the environmental groups' trial request and held a seven-day bench trial on three issues:

> (1) Whether the Forest Service has, in practice, as required by the regulations, kept current and adequate inventories and monitoring data for key resources in the national forests in Texas; (2) Whether the Forest Service has, in practice, as required by the regulations, protected key resources in its application of even-aged management techniques; and (3) Whether the Forest Service has, in practice, as required by the regulations, provided for diversity of plant and animal communities in its application of even-aged management techniques.

*Sierra Club*, 974 F. Supp. at 912. To establish its jurisdiction, the court concluded that the environmental groups had challenged a "final agency action," a prerequisite to suit against an administrative agency under the Administrative Procedure Act ("APA"). The court identified the final agency action as the Forest Service's general allowance of even-aged management in the Texas forests rather than any specific timber sales the Forest Service decided to allow in the forests:

> The Forest Service's failure to implement timber sales in compliance with the NFMA and regulations, as alleged by Plaintiffs, is a final agency action for purposes of section 704. Once the Forest Service adopted a final, definite course of action or inaction with respect to the management of the forest lands (regardless of whether that action or inaction is memorialized in a written agency decision), the court has a "final agency action" to review.

*Id.* at 914 (discussing 5 U.S.C. § 704).

On the merits, the court concluded that the Forest Service had violated its duties under the NFMA to protect resources and to monitor and inventory.[8] Accordingly, the court entered a

---

[8] Specifically, the court determined that the Forest Service was violating its duties to protect: soil resources, *see* 16 U.S.C. § 1604(g)(3)(E)(i), (g)(3)(F)(v); 36 C.F.R. § 219.27(a)(1), (b)(5), (c)(6), (f); and watershed resources, *see* 16 U.S.C. § 1604(g)(3)(E)(i), (g)(3)(E)(iii), (g)(3)(F)(v); 36 C.F.R. § 219.27(a)(1), (a)(4), (b)(5), (c)(6), (e), (f). *See Sierra Club*, 974 F. Supp. at 942. Additionally, the court found that the Forest Service was not inventorying and monitoring the following properly: wildlife, *see* 16 U.S.C. § 1604(g)(2)(B), (g)(3)(C); 36 C.F.R. §§ 219.11(d), 219.12(d), (k), 219.19(a)(1), (a)(2), (a)(5), (a)(6); diversity, *see* 36 C.F.R. § 219.26; and its success in meeting its objectives and adhering to its standards, *see* 36 C.F.R. § 219.12(k). *See Sierra Club*, 974 F. Supp. at 942.

permanent injunction barring the Forest Service from allowing almost any timber harvesting[9] "until such time that the Forest Service (1) complies with the NFMA and regulations with respect to the implementation of past timber sales and (2) assures the court that any future timber harvesting will be in compliance on-the-ground." *Id.* at 945.

The Forest Service appealed,[10] challenging several aspects of the court's ruling. A panel of this court affirmed. *See Sierra Club v. Glickman*, 185 F.3d 349, 375 (5th Cir. 1999). Significantly, the panel found that the environmental groups had challenged two distinct final agency actions: "the decision to engage in timber sales resulting from even-aged management and the failure to inventory and to monitor [certain species]." *Id.* at 364. We granted *en banc* review, *see Sierra Club v. Glickman*, 204 F.3d 580 (5th Cir. 2000), thereby vacating the panel opinion, and we directed the parties to address whether the environmental groups had actually challenged a specific final agency action.

**II**

The NFMA does not provide for judicial review of Forest Service decisions, and therefore the general review provisions of the APA apply by default. *See American Airlines, Inc. v. Herman*,

---

[9]       The court continued to allow harvesting "for insect or disease control, fire protection, or any other reason necessary to maintain the health of the forest land." *Id.* at 945.

[10]       The Texas Forestry Association and the Southern Timber Purchasers Council, to whom we had previously granted leave to intervene, *see Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir.1994), separately appealed.
       On appeal, the environmental groups continue to make clear that they are broadly challenging Forest Service practice in the Texas forests rather than limiting their challenge to discrete sales. *See, e.g.*, Br. of TCONR and Sierra Club at 5 ("The facts, testimony and photographs demonstrated overwhelming violations of laws and regulations in Compartment 98 and throughout the Texas National Forests."); *id.* at 12 ("This lawsuit is not an appeal of an adjudicatory decision by the Forest Service. It is a challenge to the *carrying out and results of* (not a *plan for*) clearcutting and its variant harvesting practices in Texas National Forests.") (emphases in original); *id.* at 26 ("The Forest Service's carrying out of its even-age logging program, and the physical results thereof, are substantive actions specifically covered by NFMA."); *id.* at 33 ("The violations of law are ongoing, occur throughout the Texas National Forests, and could not be remedied absent the relief granted by the district court."); Br. of Wilderness Society at 29 ("Where there is systemwide impact, there may be systemwide relief.").

176 F.3d 283, 287 (5th Cir. 1999). These provisions limit our review to a "final agency action." *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"). Final agency actions are actions which (1) "mark the consummation of the agency's decisionmaking process," and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (quotations omitted). The final action must be "an identifiable action or event." *Lujan*, 497 U.S. at 899, 110 S. Ct. 3177. Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct. *See American Airlines*, 176 F.3d at 287.

In *Lujan*, the plaintiff challenged the Secretary of the Interior's entire "land withdrawal review program." *See Lujan*, 497 U.S. at 877-79, 110 S. Ct. 3177. The program covered the Bureau of Land Management's ("BLM's") activities in complying with the Federal Land Policy and Management Act of 1976 ("FLPMA"). *See id.* at 877, 110 S. Ct. 3177. The Court found that the plaintiff's claim failed because the plaintiff had not challenged a particular final agency action. Instead of limiting its challenge to a "single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations," the plaintiff challenged "the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA." *Id.* at 890, 110 S. Ct. 3177.

*Lujan* thus announced a prohibition on programmatic challenges: "respondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id*. at 891, 110 S. Ct. 3177. The decision makes clear that this prohibition is motivated by institutional limits on courts which constrain our review to narrow and concrete actual controversies. *See id.* at 891-94, 110 S. Ct. 3177. We thereby not only avoid encroaching on the other branches of government, but we continue to respect the expert judgment of agencies specifically created to deal with complex and technical issues. *Cf., e.g.*, *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 444 (7th Cir. 1990) ("Administrative agencies deal with technical questions, and it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency. Trees may seem far removed from the arcana of administrative determination, but one has only to glance at the documents submitted in this case to realize that 'silviculture' is in fact a technical field, and not just one with a dry and forbidding vocabulary."); *Espy*, 38 F.3d at 799 ("NFMA was an effort to place the initial technical, management responsibility for the application of NFMA guidelines on the responsible government agency, in this case the Forest Service.") (quotations omitted).

The environmental groups' challenge is precisely the type of programmatic challenge that the Supreme Court struck down in *Lujan*. The environmental groups challenged past, ongoing, and future timber sales approved by the Forest Service, and they argued that the Forest Service failed to monitor and inventory properly in conducting these sales. This challenge sought "wholesale improvement," *see Lujan*, 497 U.S. at 891, 110 S. Ct. 3177, of the Forest Service's "program" of

timber management in the Texas forests, objecting to Forest Service practices throughout the four National Forests in Texas and covering harvesting from the 1970s to timber sales which have not yet occurred. This is not a justiciable challenge because the program of timber management to which the environmental groups object does not "mark the 'consummation' of the agency's decisionmaking process," *Bennett*, 520 U.S. at 178, 117 S. Ct. 1154, or constitute "an identifiable action or event," *Lujan*, 497 U.S. at 899, 110 S. Ct. 3177 ("[T]he 'land withdrawal review program' is not an identifiable action or event."). Instead, as in *Lujan*, the environmental groups have impermissibly attempted to "demand a general judicial review of the [Forest Service's] day-to-day operations." *Id.* The district court's accession to this demand, by reviewing and then enjoining almost all of the Forest Service's program of timber management in Texas forests until the Forest Service complies with the NFMA, exceeded the court's jurisdiction under the APA.[11]

Nor is this programmatic challenge made justiciable by the fact that the environmental groups identified some specific sales in their pleadings that they argue are final agency actions. The environmental groups can challenge "a specific 'final agency action' [which] has an actual or immediately threatened effect," even when such a challenge has "the effect of requiring a regulation,

---

[11]    Some of the individual acts the environmental groups challenge present their own justiciability problems which the environmental groups seek to avoid by consolidating them into its programmatic challenge. The environmental groups could not directly challenge many of the completed timber sales whose effects they complain of because these sales would now be moot. *See Florida Wildlife Fed'n v. Goldschmidt*, 611 F.2d 547, 549 (5th Cir. 1980) ("Where the activities sought to be enjoined have already substantially occurred and the appellate court can not undo what has already been done, the action is moot."). Insofar as the environmental groups challenge a failure to inventory or monitor that has not yet resulted in any legal consequences, these challenges are not ripe. *Cf. Ohio Forestry Ass'n*, 523 U.S. at 733-34, 118 S. Ct. 1665 (finding that a challenge to an LRMP was not ripe because the Plan's provisions "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. . . . [B]efore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court."); *Ecology Center, Inc. v. United States Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999) ("[A]lthough the Forest Service's monitoring duty is mandatory under the Plan, legal consequences do not necessarily flow from that duty, nor do rights or obligations arise from it.").

a series of regulations, or even a whole 'program' to be revised by the agency." *Lujan*, 497 U.S. at 894, 110 S. Ct. 3177. However, this ability does not allow the environmental groups to challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program, which is precisely what they did here. Rather than limit their challenge to individual sales, they merely used these sales as evidence to support their sweeping argument that the Forest Service's "on-the-ground" management of the Texas forests over the last twenty years violates the NFMA. This is clear from their allegations, which addressed the entire Texas forests, from their evidence, which concerned practices throughout the Texas forests and which dated back to implementation of the NFMA, and from their requested relief.

Similarly, the district court noted three broad trial issues before it, going to the Forest Service's entire management of the Texas forests. *See Sierra Club*, 974 F. Supp. at 912 (stating one issue as "[w]hether the Forest Service has, in practice, as required by the regulations, kept current and adequate inventories and monitoring data for key resources *in the national forests in Texas*") (emphasis added). The court did not limit its review to any specific sales but repeatedly reviewed NFMA compliance "on-the-ground"—*i.e.*, throughout the Texas forests. *See, e.g.*, *id.* at 918 (justifying its decision to focus primarily on sales in one compartment by stating that "the activities occurring on Compartment 98 of the Sam Houston National Forest are generally typical of even-aged regeneration activities across the National Forests in Texas."); *id.* at 927 (finding that "[o]n-the-ground, however, the Forest Service permits logging for timber production purposes right up to the stream banks throughout the National Forests in Texas."). It then granted correspondingly broad relief barring almost all timber harvesting in the Texas forests. *See Sierra Club*, 974 F. Supp. at 945.

The scope of the environmental groups' claims and the relief they obtained go well beyond

-12-

any challenge to discrete sales. Both make clear that the environmental groups improperly obtained "a general judicial review of the [Forest Service's] day-to-day operations." *Lujan*, 497 U.S. at 899, 110 S. Ct. 3177. *Lujan* is controlling on this point: "it is at least entirely certain that the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members." *Id.* at 892-93, 110 S. Ct. 3177; *see also id.* at 879, 110 S. Ct. 3177 (finding no final agency action, even though "[a]ppended to the amended complaint was a schedule of specific land-status determinations, which the complaint stated had been 'taken by defendants since January 1, 1981'").[12]

The environmental groups also cannot maintain their challenge under the alternative theory that the Forest Service "failed to act." In certain circumstances, agency inaction may be sufficiently final to make judicial review appropriate. *See* 5 U.S.C. § 706(1) (allowing courts "to compel agency action unlawfully withheld or unreasonably delayed"); *Sierra Club v. Thomas*, 828 F.2d 783, 792-96 (D.C. Cir. 1987) (discussing different forms of agency inaction). The Forest Service's alleged failure to comply with the NFMA in maintaining Texas's national forests, however, does not reflect agency inaction. The Forest Service has not failed to issue an LRMP or to conduct timber sales. Nor have the environmental groups argued that the Forest Service did not attempt to comply with the NFMA.

---

[12] Disagreeing with our reading of *Lujan*, the dissent would hold that the environmental groups' references to specific timber sales makes their challenge to the entire administration of the Texas forests justiciable. As discussed above and in Part I.B, we think it clear that the environmental groups were challenging the Forest Service's entire program of administering Texas forests. Additionally, as the above-cited language from *Lujan* makes clear, a plaintiff cannot challenge an entire program simply by referencing specific actions undertaken as part of that program. Instead, the necessary institutional limitations on courts which *Lujan* identified limit our review of agency action to only specific and final agency actions.

Instead, the Forest Service has been acting, but the environmental groups simply do not believe its actions have complied with the NFMA. *Cf. Ecology Center, Inc. v. United States Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999) ("This court has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action 'dressed up as an agency's failure to act.'"); *Public Citizen v. Nuclear Regulatory Comm'n*, 845 F.2d 1105, 1108 (D.C. Cir. 1988) ("The agency has acted. . . . Petitioners just do not like what the Commission did. . . . Our acceptance of petitioners' argument would make a nullity of statutory deadlines. Almost any objection to an agency action can be dressed up as an agency's failure to act.").

Underlying the district court's opinion was a concern that finding no final agency action here "would put all of the Forest Service's on-the-ground violations of the NFMA and regulations beyond review." *Sierra Club*, 974 F. Supp. at 915. This concern is misplaced insofar as the environmental groups still may challenge discret e site-specific sales allowed by the Forest Service. *See Ohio Forestry Ass'n*, 523 U.S. at 734, 118 S. Ct. 1665 ("[B]efore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court."); *id.* at 734-35, 118 S. Ct. 1665 ("The Sierra Club . . . . does not explain, however, why one initial site-specific victory (if based on the Plan's unlawfulness) could not, through preclusion principles, effectively carry the day."); *Lujan*, 497 U.S. at 894, 110 S. Ct. 3177 (noting that a challenge to a specific final agency action "may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns"). Judicial review can then take place with the "benefit of the focus that a particular logging proposal could provide." *Ohio Forestry Ass'n*, 523 U.S. at 736, 118

-14-

S. Ct. 1665.

This is precisely what the plaintiffs did in *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999). The plaintiffs challenged seven timber sales in a Georgia national forest, arguing that the Forest Service's decision to permit the sales violated the NFMA.[13] *See id.* at 2. The Eleventh Circuit considered the merits of their discrete challenge because it presented a concrete, justiciable controversy. *See id.* at 3-8 (finding that the Forest Service violated the NFMA and accompanying regulations in allowing the timber sales); *cf. Inland Empire Public Lands Council v. United States Forest Serv.*, 88 F.3d 754, 759-65 (9th Cir. 1996) (reviewing the merits of a NFMA and NEPA challenge to eight proposed timber sales on the merits); *Sierra Club v. United States Forest Serv.*, 46 F.3d 835, 839-40 (8th Cir. 1995) (reviewing the merits of a NEPA challenge to two timber sales).

Similarly, the Wilderness Society appears to argue that our ruling will prevent it from challenging the manner in which specific timber sales are implemented. This issue is not before us because the environmental groups did not attack the implementation of specific timber sales but rather attacked general Forest Service practice in the Texas forests. Thus, we need not address whether the implementation of a timber sale, as opposed to the announcement of the timber sale, is a final agency action which can be challenged in court. Nor need we address limits plaintiffs face on when they can introduce evidence of past timber sales and their implementation to show that specific timber sales

---

[13]    The *Martin* plaintiffs limited their challenge to these sales, sought relief only as to these sales, and did not attempt to challenge the Forest Service's general administration of national forests. Accordingly, the court did not even need to address the final agency action issue we discuss here.

In contrast to *Martin*, but closer to the case here, is *Ecology Center*. In *Ecology Center*, the plaintiff challenged the Forest Service's failure to monitor resources under an LRMP, arguing that this violated the NFMA and its implementing regulations. The Ninth Circuit affirmed the lower court's dismissal for lack of subject matter jurisdiction because the plaintiff had not challenged a final agency action. *See Ecology Center*, 192 F.3d at 926. Although the challenge in *Ecology Center* was narrower than the sweeping challenge here, both challenges ask the court to review some agency conduct which does not mark the culmination of a decision-making process.

-15-

before the court are improper. Instead, we determine that where, as here, the challenge extends to general forestry practices, we lack jurisdiction to consider it.

Requiring plaintiffs to challenge individual timber sales may place a higher burden on environmental groups wishing to monitor Forest Service management practices. However, this does not allow us to disregard the jurisdictional requirement of a final agency action. *See Lujan*, 497 U.S. at 894, 110 S. Ct. 3177 (rejecting the plaintiff's programmatic challenge even though "[t]he case-by-case approach . . . is understandably frustrating to an organization such as respondent"); *cf. Ohio Forestry Ass'n*, 523 U.S. at 735, 118 S. Ct. 1665 ("[T]he Court has not considered this kind of litigation cost-saving sufficient by itself to justify review in a case that would otherwise be unripe."). As the Court noted in *Lujan*, judicial review of specific final agency actions "is the traditional, and remains the normal, mode of operation of the courts." *Lujan*, 497 U.S. at 894, 110 S. Ct. 3177. Courts are not equipped, nor are they the proper body, to resolve the technical issues involved in agency decision-making at "a higher level of generality." *Id*. Instead, until confided to us, these kinds of "sweeping" review are reserved to the other branches "where programmatic improvements are normally made." *Id.* at 891, 110 S. Ct. 3177.

### III

Under the APA, the district court only had jurisdiction over challenges to identifiable final agency actions. *See* 5 U.S.C. § 704. Here, the district court acted outside its jurisdiction in reaching the merits of the environmental groups' programmatic challenge, thereby ignoring the critical limits on judicial review which define the role of courts in the modern administrative state. Because this was improper, we VACATE the court's judgment and REMAND for proceedings not inconsistent

with this opinion.[14]

---

[14] These proceedings may include a trial limited to any existing specific final agency actions the environmental groups wish to challenge, such as announced timber sales, which have "an actual or immediately threatened effect." *See Lujan*, 497 U.S. at 894, 110 S. Ct. 3177.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring.


The district court held that "[o]nce the Forest Service adopted a final, definite course of action or inaction with respect to the management of the forest lands (regardless of whether that action or inaction is memorialized in a written agency decision), the court has a 'final agency action' to review."[15] It is this jurisdictional holding that we reverse today. A challenge to a "course of action or inaction with respect to the management of the forest lands" is the epitome of a "programmatic" challenge over which federal courts have no jurisdiction.[16]

We do not rule today on any issue besides jurisdiction. But the mere holding that the plaintiffs must challenge a final agency action does not describe what a proper complaint or trial would look like. While we do not reach the issue of whether any of the evidence presented or relief granted was proper or not,[17] I comment briefly on these issues to provide guidance to the trial court on remand.

Regarding allegations and proof, the plaintiffs must allege

---

[15] *Sierra Club v. Glickman*, 974 F. Supp. 905, 914 (E.D. Tex. 1997).

[16] *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990).

[17] *See* maj. op. at 14-16.

and prove that a specific timber sale[18] will violate the law. This is not a formalism. Once the plaintiff identifies a sale, it can then direct the court's attention to those steps leading up to and including the sale's implementation that render the sale illegal. In the initial stages of this litigation, the plaintiffs did this. They challenged the Forest Service's LRMP and environmental impact statements—early steps in the process of forest management with forest-wide application. *Sierra Club v. Espy*[19] upheld their validity, agreeing with the Forest Service that even-age management does not violate the NFMA and NEPA.[20]

After *Sierra Club v. Espy*, the plaintiffs abandoned their sale-specific challenge to the Forest Service's activities; they instead challenged on-the-ground conduct throughout the Texas National Forests. In doing so, they strayed beyond the jurisdiction of the federal courts. The next logical step would have been to challenge the site-specific decisionmaking by the Forest Service. This has at least two components: the procedure of creating a project implementation plan and drafting a contract of sale, and the actual implementation, on-the-ground, of the requirements

---

[18] The announcement of a timber sale is a final agency action. We do not today address whether implementation of a timber sale also constitutes final agency action. *See* maj. op. at 15.

[19] 38 F.3d 792 (5th Cir. 1994).

[20] Plaintiffs conceded, and the court held, that the scope of the preliminary injunction at issue was limited to nine identified timber sales. *Id.* at 798.

contained in those documents.[21] These components require different evidence: the former depends on the conformity of the documents to the controlling regulations and forest plans; the latter requires a fact-intensive inquiry into whether actual implementation conforms to those documents. More importantly, which of these components is the source of any alleged illegality will affect the scope and content of any injunction the court enters.

As this case demonstrates, a generalized challenge glosses over these distinctions. It leaves the district court with a Hobson's choice: either entering an injunction that is too vague to distinguish between legal and illegal future sales, or devising some sort of prescriptive relief that may not address what is wrong with the challenged sales.[22]

On the other hand, requiring a challenge to final agency action does not straightjacket plaintiffs in presenting evidence on implementation. Since the implementation of a challenged timber sale necessarily has not occurred at the time of suit, evidence of improper implementation must come from past sales. Thus, there is nothing wrong per se with evidence of the Forest Service's implementation of timber sales from past years. Nor is there

---

[21] At trial, the *defendants* presented testimony describing the development of the project implementation plan and timber sale contract preceding implementation. Plaintiffs, however, ignored these procedures. They neither argued that those documents violated the regulations or forest plans nor did they argue that the implementation of timber sales violated the project implementation plans or contracts.

[22] *Cf. Sierra Club v. Glickman*, 794 F. Supp. at 945 (weighing prospective injunction and prescriptive, retrospective injunction).

necessarily any error in defendants presenting evidence from a single compartment and testifying that it is typical of Forest Service practice. What is important is that the plaintiffs must prove, and the trial court must find by a preponderance of the evidence, that the Forest Service will violate the law in executing or implementing the specific, challenged timber sale. The court does not have jurisdiction to grant relief to plaintiffs based on the generalized past practices of the defendants; evidence not probative of future violations should not be admitted.

Finally, as to remedy, a court may not enjoin an entire program, such as the selling of timber in the Texas National Forests. But a component of enjoining a discrete, challenged action is enjoining the conduct that makes the challenged actions illegal. Thus, an injunction directed at specific sales may prevent the completion of unnamed, future timber sales that share the illegality of the challenged sales.[23]

Unlike a programmatic challenge, a challenge to a specific timber sale would bring into focus the nature of the illegality the plaintiffs allege. The actions taken by the Forest Service during the execution of a timber cut are made pursuant to Service's site-specific "project implementation plan" and the provisions of the

---

[23] *See Lujan v. National Wildlife Federation*, 497 U.S. at 894 (citation omitted):

[W]e intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediate threatened effect. Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole "program" to be revised by the agency in order to avoid the unlawful result that the court discerns.

contract for the sale of that timber. Thus, a challenge to an announced timber sale would involve two prongs: either a challenge to the validity of any resulting project implementation plan or contract, or proof that the on-the-ground actions of the Forest Service will violate any valid project implementation plan or contract (which conforms to the regulations and LRMP).

In this case, the plaintiffs presented no evidence about project implementation plans or contracts. But a challenge to specific timber sales would require a ruling on the validity of any (existing or potential) project implementation plan or contract before the issue of on-the-ground implementation even arose. This places a greater burden on plaintiffs; but if they prove that those documents violate the regulations or the LRMP, or that the Forest Service cannot create a valid project implementation plan (for example, due to failure to keep or make necessary records), plaintiffs need not even reach the issue of on-the-ground implementation.

Also, a suit and trial on specific timber sales will focus the attention of the parties on the issue of improper implementation of the regulations and LRMP. Much of the evidence at trial in this case revisited the validity of the regulations, LRMP, and even the practice of even-age harvesting. The plaintiffs presented evidence that conformity with the regulations and LRMP violated the law. This, of course, challenges not the implementation of the regulations and the LRMP, but their validity, which was settled by

*Sierra Club v. Espy*. Given the validity of the regulations and the LRMP, the plaintiffs must prove that the on-the-ground actions of the Forest Service were inconsistent with the regulations and LRMP.

CARL E. STEWART, Circuit Judge, with whom POLITZ, WIENER, BENAVIDES, and DENNIS, Circuit Judges, join, dissenting:

The majority has held that the plaintiffs in this case did not limit their challenge to final agency actions of the United States Forest Service, and that therefore the district court exceeded its jurisdiction in hearing the plaintiffs claims. Based on the record in this case and applicable case law I cannot agree with the conclusion reached by the majority. For the following reasons I respectfully dissent.[24]

The majority opinion relies primarily on the Supreme Court's decision in Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed. 2d 695 (1990). From the beginning, I have disagreed with the majority's broad interpretation of the Lujan holding. The facts of the present case are significantly different from those in Lujan, and the holding of that case does not foreclose the type of challenge put forth by the plaintiffs in the present case.

The plaintiffs in Lujan challenged the "land withdrawal review program" of the Bureau of Land Management ("BLM"). Lujan, 497 U.S. at 890. The Supreme Court emphasized that the "land withdrawal review program" challenged by the plaintiffs did not "refer to a

_____

[24] Too many trees have already been spent, literally and figuratively, to warrant a lengthy dissent recounting all of the complicated factual and procedural history of this case. For a fuller explanation of the factual and procedural background, and the district court's findings on the merits of the plaintiffs' claims see the original panel opinion in this matter at 185 F.3d 349 (5th Cir. 1999).

-24-

single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. [the land withdrawal review program] is simply the name by which petitioners have occasionally referred to the continuing operations of the BLM...″ Id. The plaintiffs in Lujan made an extremely broad and general challenge to agency actions. The Lujan plaintiffs failed to identify any single BLM order, regulation or coherent set of policies that they felt had been violated.

Clearly, the plaintiffs allegations in the present case are infinitely more developed and specific than the allegations made by the plaintiffs in Lujan. The majority concedes that in this litigation the plaintiffs "identified specific Forest Service acts which they allege violate the NFMA." The majority also acknowledges the specific allegations set forth by the plaintiffs in the Fourth Amended Complaint. The Fourth Amended Complaint demonstrates that the plaintiffs complained of specific decisions by the Forest Service to permit even-aged timber management and timber sales. The plaintiffs did not challenge the Forest Service management procedures as a whole, but instead identified the specific harms which they sought to have redressed. The Fourth Amended Complaint alleges that:

> From on or about August 22, 1991, through September 26, 1991, Defendants made decisions to sell timber by even-aged logging on at least 16 compartments in all four national forests in Texas. Defendants will make these sales in the near future, unless restrained. Parties appealed these 16 administratively. Defendants always denied the appeals, in a standard way... Attached as Exhibit A is a list of some of the sales.

(R. 5024). Exhibit A lists the specific compartments marked by the Forest Service for timber sales.

The majority has also acknowledged the "Supplemental Complaint" submitted by the plaintiffs identified 18 scheduled even-age cutting decisions. Thus, unlike the plaintiffs in Lujan who failed to identify "a single [agency] order or regulation, or even...a completed universe of particular [agency] orders and regulations," the plaintiffs in this case have continuously identified specific agency actions which they allege violate the NFMA. Perhaps the most telling piece of evidence from the record is the fact that the district court was able to conduct a seven-day bench trial on the plaintiffs allegations regarding the even-aged management practices of the Forest Service in this case. The evidence submitted at trial focused on specific sales and specific pieces of land.

The majority does not dispute that in the Fourth Amended Complaint, and the "Supplemental Complaint"the plaintiffs cited specific timber sales and actions taken by the Forest Service which they alleged violate the NFMA. It appears that the majority's central argument is that the plaintiffs pleadings also contain general allegations regarding the Forest Service's even-aged management and clearcutting practices. The majority is suggesting that the use of these general allegations dilutes or negates the existence of the plaintiffs specific allegations challenging specific timber sales and specific decisions made by the Forest Service.

Lujan does not prohibit plaintiffs from combining both general and specific allegations in their complaint, instead Lujan simply requires that a plaintiff must direct its attack against "some particular 'agency action' that causes it harm." Id. The Supreme Court stated that the purpose of requiring a plaintiff to challenge a specific agency action is to insure that "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." Id. In the present action, the plaintiffs allegations fit squarely within these parameters. The

plaintiffs in the Fourth Amended Complaint, their Request for Trial, and their Supplemental Complaint listed the specific compartments where the Forest Service allegedly violated the NFMA through its clearcutiing, timber harvesting, and even-age logging practices. The plaintiffs were able to reduce their more general allegations to a manageable proportion that allowed the district court to conduct a bench trial on specific compartments of land in the Texas forest. Contrary to the intimation of the majority opinion, the experienced trial judge below was not oblivious to the parameters of Lujan when he embarked on the trial at issue. See Sierra Club v. Glickman, 974 F.Supp. 905, 914.

Unlike the majority, I view the allegations made by plaintiff Sierra Club in the present case to be strikingly similar to the allegations made by the Sierra Club in Sierra Club v. Martin, 168 F.3d 1 (11th Cir. 1999). In Martin, the plaintiffs challenged the "Forest Service's *decision to allow seven timber sales*...which will enable logging (including clearcutting), road building and related activities." Id. at 2. Although the sales had not been completed the court concluded that the plaintiffs were "entitled to challenge the Forest Service's compliance with the [LRMP] as part of its site-specific challenge to the timber sales...a contrary result would effectively make it impossible for a plaintiff to ever seek review of the Forest Service's compliance with a Forest Plan." Id. at 6. In the present case, as in Martin, the plaintiffs have challenged the Forest Service's decision to allow timber sales which enable clearcutting. Similarly to Martin, the plaintiffs made site-specific challenges to timber sales, which enabled even aged timber management practices to occur which they claimed violated the NFMA.

Moreover, although the majority opinion and this dissent focus on the issue of final agency action, it is important to note that there was much more at stake in this litigation besides this court's

differing interpretations of case law. The district court found on the merits that the Forest Service had violated and was continuing to violate the NFMA through their management practices. See Glickman, 904 F.Supp. at 911-12. The district court found, *inter alia*, that the Forest Service's even-aged management practices were causing severe erosion of soil which permanently impairs the productivity of the forest land. See id. at 926. In this appeal, the Forest Service did not challenge these findings made by the district court. To the extent that the majority opinion has made it more difficult for plaintiffs to challenge NFMA violations committed by the Forest Service this decision by our court may contribute to the erosion of the natural resources in the Texas national forests. Mindful of these practical implications of the majority opinion and the applicable case law I respectfully dissent.